JOSE F. SIERRA, Respondent, v ROBERT J. McGUIRE, as Police Commissioner of the City of New York, Appellant.

First Department, January 18, 1983

### APPEARANCES OF COUNSEL

*Jack Dashosh* of counsel (*Dashosh & Alai,* attorneys), for respondent.

*Debra A. James* of counsel (*Frederick A.O. Schwarz, Jr., Corporation Counsel,* attorney), for appellant.

### OPINION OF THE COURT

SULLIVAN, J.

In this CPLR article 78 proceeding Police Officer Jose Sierra challenges a determination finding him guilty, after a departmental hearing, of drawing his revolver without just cause and addressing a civilian in a discourteous and disrespectful manner, and dismissing him from the New

York City Police Department. The charges were an out-growth of a complaint filed with the police department's Civilian Complaint Review Board immediately after an incident involving a dispute between Sierra and a motorist over a traffic ticket.

On March 25, 1979, Sierra, a 12-year veteran of the police force, was assigned as a substitute chauffeur to Sergeant Edward Hojnacki. At about 12:30 A.M. the officers, proceeding north in a patrol car on Clay Avenue, stopped at the intersection of 175th Street where their attention was drawn to a horn-blowing car facing east on 175th Street, a short distance from the corner. Apparently, the operator, later identified as the complainant, Godfrey Robinson, was using the horn to signal his arrival to an occupant of an apartment house across the street. When this vehicle proceeded to the corner Sierra had to back up the patrol car which, by now, was stopped in the intersection and blocking traffic. Robinson then proceeded to make a U-turn and stop, double-parked, across the street on 175th Street in front of the corner building from which a woman, later identified as Diana Lebron, Robinson's girlfriend, emerged. Sierra pulled the patrol car up behind the double-parked vehicle. Both he and Sergeant Hojnacki exited their car and, as observed by Lebron, walked toward Robinson's car, which Lebron entered. Sierra then went to the driver's side, while the sergeant walked to the passenger's side. After this point the facts are in dispute.

Robinson, admitting that he had made a U-turn and honked his horn, testified that Sierra approached the car with his gun drawn and said to him angrily, "You made me look like a jerk. Give me your license and registration." Sierra, on the other hand, testified that he never drew his revolver and merely asked Robinson for his license and registration since he was going to issue him a summons for crossing a double white line. Robinson also testified that Sierra searched his car.

Lebron testified that she did not see a gun as the officer approached the car or as he stood by the driver's side and asked Robinson for his license and registration; although she heard Robinson ask the officer after Robinson got out of the car, "[w]hy are you pointing your pistol like that, you

don't have to, there is no reason to point the pistol at me?" At this point Lebron also got out of the car and walked to the rear, from where she saw the Sergeant walk over to Sierra. She did not see a gun at this time either. In fact, she never saw a gun throughout the entire incident. According to Lebron the officer then went back to the patrol car to write the summons.

Sergeant Hojnacki testified that an argument developed between Sierra and Robinson as Robinson, insisting that he had not crossed over a double line, protested the issuance of the summons. At one point Hojnacki heard Robinson say that "this is why cops get killed." Since the discussion between Robinson and Sierra was getting "out of hand" Hojnacki ordered Sierra back to the patrol car to write out another summons for Robinson's improper use of his horn. The sergeant testified that he did not see Sierra remove his gun at any time.

The trial commissioner credited Robinson's version of the incident and found that Sierra "overreacted in a situation where professionalism and calmness should have prevailed". Taking note of prior incidents in Sierra's record, he found Sierra to be a "violent prone officer" who should be removed from the force. The police commissioner accepted both the finding and recommendation and dismissed Sierra from the department, whereupon this proceeding was instituted. Special Term annulled the determination, and this appeal followed.

Although we agree with the substance of Special Term's determination, we are obliged to consider the proceeding, *de novo*, since the petition raised an issue of substantial evidence which should have been transferred to this court for review in the first instance. (See CPLR 7804, subd [g].) We may, however, in such cases, consider the matter, *de novo*, as though it had been transferred. (See *Matter of Rivera v Beekman*, 86 AD2d 1; *Matter of Memoli v Toia*, 68 AD2d 889; *Matter of Hammerl v Mavis*, 41 AD2d 724, affd 34 NY2d 579.)

In an article 78 review of an administrative decision made as the result of a hearing at which evidence is taken the judicial function is limited to an inquiry of whether the determination is, on the entire record, supported by sub-

stantial evidence. (See CPLR 7803, subd 4.) An ample body of guiding principles has been developed to assist courts in determining that issue. Substantial evidence has been defined as "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact". (*300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176, 180.) An administrative determination supported by such evidence has a rational basis and may not be disturbed. (*Matter of Pell v Board of Educ.,* 34 NY2d 222, 230-231.) In an administrative hearing the credibility of witnesses is a matter for the hearing officer. (*Matter of Collins v Codd,* 38 NY2d 269; *Matter of Stork Rest. v Boland,* 282 NY 256, 267.) Central to all these principles is the *caveat* "that a court may not substitute its judgment for that of the board or body it reviews *unless* the decision under review is arbitrary and unreasonable and constitutes an abuse of discretion." (*Matter of Diocese of Rochester v Planning Bd. of Town of Brighton,* 1 NY2d 508, 520.) But while the scope of article 78 review is narrow, courts are not required to render blind obeisance to an administrator's determination after a hearing, lest they abdicate their judicial responsibility. The record as a whole must be scrutinized to determine whether an administrative finding has a basis in substantial evidence. (See *Matter of McCormack v National City Bank of N. Y.,* 303 NY 5, 9.)

In order to reach his finding the trial commissioner had to credit fully the testimony of Robinson, notwithstanding that he was an interested witness, to the exclusion of all the other credible testimony which disputed his version of the incident. Not even Lebron, who was seated in the front passenger's seat at the time, supported his testimony that Sierra approached the car and pointed a gun in his face as he sat in the driver's seat. In fact, she categorically denied ever seeing a gun and, although she testified that she heard Robinson ask the officer, while both men were standing outside the car, why he was pointing his gun at him, she did not see a gun when she exited the car immediately after hearing that remark. Sergeant Hojnacki, an 18-year veteran of the police department, and the only other witness to the event, testified that he never saw Sierra draw

his revolver. Nor did he ever hear Sierra act disrespectfully towards Robinson, although both men were getting excited and raising their voices. Lebron's main contribution to this aspect of the department's case was her facile characterization that the officer appeared to be "uptight".

Thus, except for Lebron's testimony that she heard Robinson tell Sierra that he did not have to pull his gun, Robinson's testimony on the critical point of whether Sierra drew his gun went uncorroborated, notwithstanding that the incident was of relatively brief duration and was confined to the immediate area in and about Robinson's car. These are factors which normally would tend to make the respective accounts of the participants coalesce.

We find Robinson's testimony about the search of the car highly significant. According to his chronology of events the search took place after Sierra put a gun in his face and ordered him out of the car, but before his comment about the gun which prompted Lebron to exit the car. Robinson testified that the gun was out during this period. Yet Lebron, who was in the car at the time of the search, according to Robinson (she did not say anything about a search during the hearing), denied ever seeing a gun. Nor did Sergeant Hojnacki, who was standing astride the car, ever see a gun.

In concluding that Robinson's version of the incident cannot withstand analysis we are aware that the trial commissioner found him to be a credible witness. But that finding is flawed in light of the contradictory testimony of both hostile and friendly witnesses, and an obvious self-interest which colors his entire story. Nor should any trier of the facts readily accept Lebron's testimony about overhearing Robinson mention a gun, when she herself did not testify to seeing a gun which, according to Robinson, was drawn as Sierra approached the vehicle and stuck in his face as he sat in the driver's seat while Lebron admittedly sat alongside him.

"[A] finding is supported by the evidence only when the evidence is so substantial that from it an inference of the existence of the fact found may be drawn reasonably. A mere scintilla of evidence sufficient to justify a suspicion is

not sufficient to support a finding upon which legal rights and obligations are based." (*Matter of Stork Rest. v Boland,* 282 NY, at pp 273-274.) In our review of the record and applying "the only available objective test" — the test of substantial evidence — we cannot find " ' "such relevant evidence as a reasonable mind might accept as adequate to support" ' " the finding of guilt. (*Matter of Kopec v Buffalo Brake Beam-Acme Steel & Malleable Iron Works,* 304 NY 65, 71, citing *Consolidated Edison Co. v National Labor Relations Bd.,* 305 US 197.)

Finally, we note that Sierra, with a prior disciplinary record which includes the unauthorized use of a weapon, albeit in an off-duty setting, is a ready-made target for this type of accusation. He obviously is an extremely aggressive and effective police officer, as evidenced by his commendable record which, in a 12-year career, encompasses participation in nearly 800 arrests, and the award of 77 citations including 60 Excellent Police Duty Awards, 12 Meritorious Police Duty Awards, 2 Commendations, 1 Unit Citation, 1 Medal of Merit, and 1 Honorable Mention.

We are not blind to the possibility that none of the witnesses was completely truthful and that, as a result, we may never know what actually happened. Nevertheless, as Special Term noted, "[e]ven if Robinson's version of the offense is accepted at the very most the gun could have been in Sierra's hand for an extremely short period of time." Certainly, in light of the circumstances and Sierra's record, his actions should not be deemed so precipitous as to warrant the dismantling of a career. Nor does his prior disciplinary record, when considered with his actions here, warrant such a result. "[W]here the finding of guilt is confirmed and punishment has been imposed, the test is whether such punishment is ' " so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness".' " (*Matter of Pell v Board of Educ.,* 34 NY2d 222, 233, citing *Matter of McDermott v Murphy,* 15 AD2d 479, affd 12 NY2d 780; *Matter of Stolz v Board of Regents,* 4 AD2d 361.)

Accordingly, the order and judgment (one paper), Supreme Court, New York County (OKIN, J.), entered October 7, 1981, which, *inter alia,* annulled respondent police com-

missioner's determination of November 20, 1980 dismissing petitioner as a member of the Police Department of the City of New York and remanded the matter for further proceedings, should be vacated, and under the provisions of CPLR 7804 (subd g) this court treats the proceeding as if it had been transferred to it in the first instance, and the petition is granted and the determination annulled, without costs or disbursements.

KUPFERMAN, J. (concurring in result). It would seem that the complainant's actions were provocative, but the police officer overreacted. Nonetheless, while the police officer deserves censure, the situation does not warrant dismissal, and so I concur in the result.

ALEXANDER, J. (dissenting). While I agree that Special Term's order should be reversed, I would reinstate the determination of the respondent police commissioner and dismiss the petition.

In my view, this court, as did Special Term, under the guise of determining the existence of "substantial evidence", has impermissibly substituted its view as to the credibility of witnesses for that of the trial commissioner. While the majority appropriately observes that "[i]n an administrative hearing the credibility of witnesses is a matter for the hearing officer" and " 'that a court may not substitute its judgment for that of the board or body it reviews *unless* the decision under review is arbitrary and unreasonable and constitutes an abuse of discretion' ", it nevertheless proceeds to do that which is interdicted by the cases cited in support of the propositions quoted.

To conclude on the basis of this record as does the majority that the trial commissioner fully credited the testimony of Robinson "to the exclusion of all the other credible testimony which disputed his version of the incident", and that the finding that Robinson was a credible witness "is flawed in light of the contradictory testimony of both hostile and friendly witnesses" misreads the record and overstates the case. The only one who *disputed* the claim that Sierra drew his revolver was Sierra. Both Lebron and Hojnacki, merely testified that they did not *see* Sierra's gun drawn, which is quite understandable given the relative positions of the individuals during the encoun-

ter. Lebron testified that when she exited from the vehicle and walked to the rear of the car where Robinson, Sierra and Hojnacki were, that Robinson was positioned between herself and Sierra who was outside the car at the time she heard Robinson assert that Sierra had his gun drawn and pointed at him. Hojnacki testified that he was positioned on the passenger's side of the vehicle, approximately eight feet from Sierra and Robinson. He testified that he did not *see* Officer Sierra draw his revolver during the incident. Critical to an evaluation of Sergeant Hojnacki's testimony is the following exchange:

"Q. Did you see Officer Sierra at all times?

"A. If I was looking at Officer Sierra, I could see some part of his body at all times, correct.

"Q. Did you see where his gun was?

"A. I don't believe so.

"Q. Now, again, when you were interviewed by the C.C.R.B. [Civilian Complaint Review Board], when you were asked regarding Police Officer Sierra removing his weapon, isn't it a fact that you were asked a question about the weapon being drawn that you said I could not see or do I know if the Police Officer's gun was drawn, I was on the other side of the car, is that correct?

"A. That is correct."

Thus neither Lebron nor Hojnacki contradict Robinson and their failure to "corroborate" Robinson's testimony that Sierra had his revolver drawn is more reasonably explained by the conclusion that they could not see because of their respective positions than by the conclusion that Sierra did not in fact have his revolver drawn.

Other testimony of these witnesses, however, does tend to support Robinson's version of the incident.

For example, both Lebron and Hojnacki confirmed the fact that Sierra and Robinson were in a fairly heated argument and that Sierra was "Upset, up-tight" to the extent that Hojnacki intervened and *ordered* him to return to the radio motor patrol car to issue a summons to Robinson for the traffic violation. Additionally, Hojnacki corroborated Robinson's version of the genesis of this incident,

that there was a mix-up in traffic and that as the radio motor patrol car was going through the intersection of Clay Avenue and 175th Street "the other guy was coming the other way, and exactly what happened, I don't know, but there was a little confusion in the traffic, or who was going to go through first." He further testified that after Robinson blew his horn "he proceeded into the intersection where we were and there was a little mixup with traffic, then Mr. Robinson made a U turn and pulled in front of a building, then officer Sierra backed our car up." Bearing in mind that Sierra was a substitute driver for Hojnacki that evening, it is not surprising that he became upset as a result of this "traffic mixup" to the extent that he may very well have said to Robinson upon his approach to Robinson's vehicle that "you made me look like a jerk".

In the not too distant past our Court of Appeals has had occasion to again refer to the rule enunciated by then Chief Judge LEHMAN in *Matter of Stork Rest. v Boland* (282 NY 256, 267): " '[w]here there is conflict in the testimony produced * * * where reasonable men might differ as to whether the testimony of one witness should be accepted or the testimony of another witness be rejected, where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the [administrative agency]. The courts may not weigh the evidence or reject the choice made by [such agency] where the evidence is conflicting and room for choice exists' ". (*Matter of Collins v Codd,* 38 NY2d 269, at pp 270-271; see, also, *Matter of Pell v Board of Educ.,* 34 NY2d 222, 231, 233; *Matter of Avon Bar & Grill v O'Connell,* 301 NY 150, 153.)

The trial commissioner heard the testimony of the various witnesses, including that of Lebron and Hojnacki, in which they said they did not see Sierra with his gun drawn and the conflicting testimony of Robinson and Sierra as to whether Sierra did in fact have his gun drawn. The commissioner elected to find Robinson "a credible witness and accept[ed] his version of what had occurred." He further found that while Robinson became upset when he received what he believed was a wrongfully issued summons, he did not fabricate the complaint against Sierra because of his

anger. On the other hand the commissioner found that "the Respondent [Sierra] overreacted in a situation where professionalism and calmness should have prevailed, and the Respondent escalated a routine situation by his lack of control and poor judgment." These findings are grounded in substantial evidence and should not be disturbed.

While one might argue that in other circumstances an isolated incident of this sort would not warrant dismissal of a 12-year veteran from the police force, the commissioner pointedly observed that Sierra's prior disciplinary record was extensive and was considered as very serious. That prior record involved a four-month suspension without pay for "wrongfully and without just cause * * * cocking and pointing his revolver" and "wrongfully and without just cause utter[ing] disrespectful remarks to occupants of a Department Vehicle after said occupants had identified themselves as members of the service on official duty and had displayed vehicle identification plate." Indeed, it appears that Sierra was "under the influence of an intoxicant" on that occasion and that he "put his cocked revolver into the chest of one person, with finger on hammer of said revolver, having been informed that said person was a member of the service." This conduct hardly bespeaks of mere aggressiveness.

The hearing examiner aptly observed "this Department can ill afford to retain a member of the service who conducts himself in a manner which is dangerous to society. The Department must take all necessary steps to lawfully remove from police service a violent [sic] prone officer once that officer has been identified. In the event the Department fails to assume this responsibility and a tragedy occurs the Department must bear the grave consequences of the officer's act."

Under these circumstances it can hardly be said that the dismissal of this officer from the police force is shocking or in anywise inappropriate.

MURPHY, P. J., and ASCH, J., concur with SULLIVAN, J.; KUPFERMAN, J., concurs in an opinion and ALEXANDER, J., dissents in an opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on October 7, 1981, vacated, and

under the provisions of CPLR 7804 (subd [g]) this court treats the proceeding as if it had been transferred to it in the first instance, and the petition is granted and the determination annulled, without costs and without disbursements.